IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

MATTHEW BRUEHL, M.D.,                )
                                     )
            Plaintiff,               )
                                     )
      v.                             )
                                     )
DUKE UNIVERSITY, DUKE                )          1:21CV590
UNIVERSITY SCHOOL OF MEDICINE,       )
DUKE UNIVERSITY HEALTH               )
SYSTEM, INC., AND PRIVATE            )
DIAGNOSTIC CLINIC, PLLC,             )
                                     )
            Defendants.              )

**MEMORANDUM OPINION AND ORDER**

Plaintiff Matthew Bruehl, M.D.[1] alleges that he was an employee of Duke

University, Duke University Medical School, Duke University Health System, Inc.,

(collectively "Duke Defendants") and Private Diagnostic Clinic, PLLC ("PDC").  He

has sued the Duke Defendants and the PDC for violating 26 U.S.C. § 7434 and the

North Carolina Wage and Hour Act ("NCWHA") for their failure to treat all of his

earnings as W-2 wages.  The PDC has moved to dismiss the action pursuant to

Rule 12(b)(6) of the Federal Rules of Civil Procedure. [Doc. #37.]  The Duke

Defendants have moved to dismiss the action pursuant to Rules 12(b)(4), (b)(5),

---

[1] Although not identified in the case caption, Dr. Bruehl brings this action "on
behalf of himself and other similarly situated individuals either currently or
previously employed by the Defendants". (Opening Statement, Second Amended
Complaint [Doc. #36].)  However, one portion of his North Carolina Wage and Hour
Act claim, the deduction from his final paycheck, is unique to him.

and (b)(6) of the Federal Rules of Civil Procedure.[2] [Doc. #39.]  Both motions are granted in part as to Count I, and the Court declines to exercise supplemental jurisdiction over Count II.

I.

For purposes of the Rule 12(b)(6) motions, the facts are construed in the light most favorable to Dr. Bruehl and all reasonable inferences are drawn in his favor. U.S. ex rel. Oberg v. Pa. Higher Educ. Assistance Agency, 745 F.3d 131, 136 (4th Cir. 2014).  On May 22, 2018, Dr. Bruehl, a licensed physician, was offered "a faculty position in the Department of Pediatrics at Duke Health" anticipated to be effective September 10, 2018. (Letter from Ann M. Reed, MD to Matthew Bruehl, MD (May 22, 2018) ("Offer Letter"), Ex. A to Second Am. Compl. ("SAC") [Doc. #36-1]; SAC ¶¶ 15-17 [Doc. #36].)  According to the Offer Letter, he would "have an appointment as an Assistant Professor, Track IV (Clinician-Teacher)" and would "be a member of the Private Diagnostic Clinic ('PDC'), [the] faculty practice plan." (See also SAC ¶ 18.)  At no time did Dr. Bruehl ask to be a member of the PDC; "he was told that being a member of the PDC was a condition of his employment." (Id. ¶ 31.)

Dr. Bruehl would perform "academic activities . . . in [his] capacity as a Duke University School of Medicine faculty member", which would account for

---

[2] Because Dr. Bruehl fails to state a § 7434 claim against the Duke Defendants even assuming sufficient process and service of process and because the NCWHA claim is being dismissed without prejudice, the Duke Defendants' motion is granted based on Rule 12(b)(6).

2

10% of his time. (Offer Letter; SAC ¶ 20.)  For the other 90% of his time, he would perform "clinical activities . . . as a member of the PDC". (Offer Letter; SAC ¶ 21.)  In turn, the entities were responsible for paying proportionate amounts of Dr. Bruehl's $160,000 annual compensation; the "University" was to pay $20,000, while the PDC was to pay $140,000. (Offer Letter; SAC ¶¶ 22-23.)  He was eligible for benefits offered by "Duke Health" and those "associated with PDC membership", and the PDC would pay a $5,000 relocation allowance. (Offer Letter; SAC ¶ 24.)

The Offer Letter informed Dr. Bruehl that he also "need[ed] to sign the PDC Operating Agreement and related documents" and concluded by saying, "We are very excited about the prospect of having you join the PDC and the faculty . . . at Duke Health." (See also SAC ¶ 25.)  He accepted the offer on June 4, 2018. (Offer Letter; SAC ¶ 16.)

On September 6, 2018, Dr. Bruehl attended the "New Member Orientation Program" for the PDC conducted by its "Benefits Representative" during which he completed and signed various documents as a "Member", including those specific to the PDC (such as "PDC Direct Deposit Form") and at least one specific to the PDC and "Duke" (such as "PDC & Duke Faculty Benefits Summary"). (Private Diagnostic Clinic, PLLC New Member Orientation Program, Ex. B to SAC; SAC ¶¶ 26-29.)  According to the completed orientation form, other documents were to be provided to Dr. Bruehl "on the PDC Intranet Site", including the "PDC Operating Agreement" and the "Departing Physician Notification", and it was his

3

"responsibility to be familiar with each policy and/or agreement." (See also SAC ¶¶ 30, 32.)  There was no "Departing Physician Notification" among the policies on the intranet, although there was a policy entitled "Departing Member; Patient Care; Confidential Information; Medical Documentation". (Id. ¶ 33.)

Dr. Bruehl's first day of work was September 10, 2018, at which time he was asked to and did sign a document entitled "The Private Diagnostic Clinic, PLLC at Duke University Medical Center Durham, North Carolina, Addendum to Company Agreement, Member" ("Member Addendum"). (Member Addendum, Ex. C to SAC (all caps removed); SAC ¶¶ 34, 35.)  The Member Addendum stated that Dr. Bruehl, "a member of the faculty of Duke University, hereby acknowledges that (s)he has read the Private Diagnostic Clinic Professional Limited Liability Company Operating Agreement of January 1, 1997, and hereby accepts all of the provisions and conditions thereof and agrees to be bound by such provisions and conditions as a Member of the Private Diagnostic Clinic." (See also SAC ¶ 36.)  The Member Addendum was to "be attached as an addendum to [the PDC Operating] Agreement", (Operating Agreement of the Private Diagnostics Clinic, PLLC, Effective September 11, 2015, Ex. D to SAC (all caps removed)), but it was not, (SAC ¶ 35).

The PDC Operating Agreement provided that a Member's earnings "shall be determined by discussion and agreement between" the Member and the "PDC Physicians Department Chair" and "may be" determined by factors such as teaching, length of service, research, contribution to medical literature, service to

4

Duke Health clinics, overall contribution to the Medical Center, gross income produced, and administrative duties. (PDC Operating Agreement § 5.3; SAC ¶ 37.) Yet, "[o]ther than" accepting the Offer Letter on June 4, 2018, Dr. Bruehl "never participated in any discussions of his earnings as a member of the PDC"; instead, his compensation for services to Duke University, Duke School of Medicine, Duke Health Services, Inc., and the PDC "was sent in his offer letter." (SAC ¶ 38.) Per the PDC Operating Agreement, he was also to "have a monthly drawing account in an amount" upon which he and his Department Chair agreed, (PDC Operating Agreement § 5.4, SAC ¶ 37), but he "had no written agreement with his Department chair as to the contents of any drawing account with the PDC", (SAC ¶ 39).

Dr. Bruehl "had no control over the income and capital of the PDC", "no right to make additional or fewer withdrawals", and "no real obligation to share losses". (Id. ¶¶ 40, 41, 48.) He "shared no mutual proprietary interest in the net profits" and "was not required to invest in the PDC". (Id. ¶¶ 41, 48; see also id. ¶ 55 (alleging that his Schedule K-1s indicate he "had no ownership interest in the PDC") (citing Schedule K-1 (Form 1065), Ex. G to SAC).) He "did not pay for [his] own marketing and advertising related to client solicitation" and was "not required to purchase or pay for the equipment and tools necessary to perform [his] job". (SAC ¶¶ 61, 62.) He was "not free to solicit [his] own clients", was "required to treat all patients assigned" to him by Duke University Health System, and "Defendants" set his work schedule. (Id. ¶¶ 58, 60, 63.) The PDC "required

5

compliance with" employment policies and procedures set by the Duke

Defendants. (Id. ¶ 64.) Dr. Bruehl "exercised no control over the responsibilities of

the PDC in any significant manner outside of the performance of his teaching and

clinical duties for" Duke University Health System. (Id. ¶ 59.) "On [his]

information and belief in 2018 and 2019 [he] was one of over 1000 'members' of

the PDC." (Id. ¶ 49.)

"DU" (Duke University) and the PDC paid Dr. Bruehl "a regular fixed monthly

wage" "pursuant to his offer letter", and "Defendants" issued him both a W-2 and

a K-1 in 2018 and 2019. (Id. ¶¶ 42, 81.) Benefits and taxes were deducted from

his "Duke University/Health System" monthly gross pay. (Duke University/Health

System Monthly Payroll Statement, Ex. E to SAC; SAC ¶ 42.) However, no taxes

were deducted from his "regular fixed monthly wage" as a PDC "employee" or

from "the occasional additional earnings payments" he received as a "member".

(SAC ¶¶ 43, 44; see also Private Diagnostic Clinic, PLLC Earnings Statement, Ex.

F to SAC.) The only deductions were for "Profit Sharing". (PDC Earnings

Statements.)[3]

Dr. Bruehl's monthly payments from the PDC were treated as "K-1 wages"

even though he "never came to any mutually negotiated agreement" to that effect

and "never actively sought membership in the PDC". (SAC ¶ 72; see also id. ¶

---

[3] Although Dr. Bruehl alleges that "payments for benefits" were deducted from his
PDC "regular fixed monthly wage", (SAC ¶ 43), those benefits were not deducted
from his pay, as evidenced by the net distributions on his earnings statements
arrived at by subtracting the profit sharing deductions from the gross distributions.

6

73.) "[I]nstead", he was "informed that [his] employment with Defendant Duke University (including the Duke University Health System and the Duke University Medical School) was conditioned upon being a member of the PDC." (Id.; see also id. ¶ 77 (alleging that his Offer Letter and the PDC Operating Agreement "made it clear that [he] could not be a faculty member employee without being a PDC member" and that the "offer to provide clinical and teaching services" to Duke University "was dependent on [his] signing the PDC Operating Agreement").)

Dr. Bruehl alleges that these circumstances show that the PDC is a "sham partnership for tax purposes" with the "sole purpose" of "limit[ing] the amount of employment taxes owed by Defendants [Duke University] and [Duke University Health System] for the clinical and teaching services" he rendered. (SAC ¶ 47; see also id. ¶¶ 55.) He claims that all Defendants "attempt[ed] to circumvent their responsibility as employers" by distinguishing "between services" that he provided "as a faculty employee of the [Duke Defendants] and [those that he provided] as a physician working for the PDC and the [Duke University Health System]". (Id. ¶ 75; see also id. ¶ 76.)

According to Dr. Bruehl, he was a "joint employee[]" of Duke University, Duke University Health System, and the PDC and the "fixed regular monthly payments" from the PDC "were wages under federal and state law" that should have been taxed. (Id. ¶¶ 45, 50; see also id. ¶ 51 (alleging that he was "treated like and functioned as [an] employee[] of the Defendants"), ¶ 52 (alleging that he "worked jointly" for all Defendants), ¶ 53 (alleging that he "should have been paid

7

a reasonable salary as [a] W-2 employee[] of Defendants"), ¶ 54 (alleging that he was "never [an] independent contractor[]"), ¶ 56 (alleging that his "status as [a] 'member[]' of the PLLC and the fact that [he] signed the PDC Operating Agreement Addendum did not transform the regular, monthly wages" from the PDC into "a bona fide distribution of profits"), ¶ 57 (alleging that "[t]he classification of the regular monthly payments . . . as membership distributions did not obviate the fact that the payments were wages . . . from which income and other taxes should have been deducted"), ¶¶ 64-66 (alleging he was "jointly employed" by all Defendants), and ¶ 97 (alleging that he "was a joint employee" of all Defendants).)

Dr. Bruehl claims that all Defendants "intentionally and willfully concocted [this] scheme whereby [they] paid [him] . . . as [a] non-employee[] or 'member[]' in order to defraud the United States government and avoid paying [their] portion of [his] . . . FICA and other payroll and other federal taxes." (Id. ¶ 79.) As a result, he was "required to pay additional taxes on the wages, including Defendants' portion of the FICA, FUTA, and other federal and state income taxes." (Id. ¶¶ 83, 84.)

In addition, Dr. Bruehl's last paycheck, in June 2019, was for $1,108.52 when it should have been for $11,666.67, a difference about which he had no prior notice and for which he never gave written consent and authorization. (Id. ¶¶ 86, 90, 99; see also id. ¶ 94.) The PDC "argue[d]" that it was not required to give him advanced notice because he was "not an employee" but that it nevertheless gave advanced notice when its counsel emailed Dr. Bruehl's counsel on July 23,

8

2019. (Id. ¶¶ 88, 89, 91, 92, 93, 95, 96.)  Dr. Bruehl's counsel "complained to Defendant PDC's counsel about the deduction" and "was told that [Dr. Bruehl] agreed to the deduction when he signed the PDC Operating Agreement". (Id. ¶ 95.)

Dr. Bruehl claims that the Duke Defendants and the PDC violated 26 U.S.C. § 7343 when they "willfully and knowingly filed false and fraudulent W-2 forms that underreported [his] earned wages because [they] intentionally issued [him] . . . wage payments from the PDC for clinical and academic teaching services as K-1 pay, without any federal or state deductions or withholdings, and failed to report such earning on [his] W-2[]" "in order to save money and avoid paying payroll taxes, including [their] portion of [his] FICA and FUTA." (Id. ¶¶ 109, 110.)

He also alleges that "Defendants' payroll practices violate the NCWHA" because he was forced "to pay additional federal and state taxes", "including Defendants' portion of the FICA and other federal and state taxes" on "wages" reported on Form K-1. (Id. ¶¶ 117, 118.)  According to Dr. Bruehl, this "increased tax liability paid by [him] constitutes an improper deduction" from his wages in violation of the NCWHA. (Id. ¶ 119.)  He also claims that the deduction from his last paycheck from the PDC "was an improper deduction" because he was an employee and never agreed "to a specific amount of deduction to his wages". (Id. ¶ 120.)

II.

To survive a motion to dismiss made pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009) (quoting Bell Atlantic Corp. v. Twombly, 550 U.S. 544, 570 (2007)). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. (citing Twombly, 550 U.S. at 556); see also McCleary-Evans v. Md. Dep't of Transp., State Highway Admin., 780 F.3d 582, 585 (4th Cir. 2015) (noting that a complaint must "contain[] sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face in the sense that the complaint's factual allegations must allow a court to draw the reasonable inference that the defendant is liable for the misconduct alleged"). However, when a complaint states facts that are "'merely consistent with' a defendant's liability, it 'stops short of the line between possibility and plausibility of 'entitlement to relief.''" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

When evaluating whether the complaint states a claim that is plausible on its face, the facts are construed in the light most favorable to the plaintiff and all reasonable inferences are drawn in his favor. U.S. ex rel. Oberg, 745 F.3d at 136. Nevertheless, "labels and conclusions[,]" "a formulaic recitation of the elements of a cause of action[,]" and "naked assertions . . . without some further factual enhancement" are insufficient. Twombly, 550 U.S. at 557. In other words, "[f]actual allegations must be enough to raise a right to relief above the speculative

level". Id. at 555. In addition to factual allegations, the court "consider[s] documents that are explicitly incorporated into the complaint by reference and those attached to the complaint as exhibits." Goines v. Valley Cmty. Servs. Bd., 822 F.3d 159, 166 (4th Cir. 2016) (internal citations omitted).

A.

Title 26 U.S.C. § 7434(a) prohibits the willful filing of "a fraudulent information return with respect to payments purported to be made to any other person" and permits "such other person" to "bring a civil action for damages against the person so filing such return." Dr. Bruehl alleges that "Defendants willfully and knowingly filed false and fraudulent W-2 forms that underreported [his] earned wages" because they "intentionally issued" his "wage payments from the PDC for clinical and academic teaching services as K-1 pay, without any federal or state deductions or withholdings, and failed to report such earning on [his] W-2s." (SAC ¶ 109; see also id. ¶ 110.)

1.

The PDC argues that, because Dr. Bruehl was a member, it submitted Schedule K-1s to the IRS as required for partnerships and that neither the Form 1065 (the partnership return) nor its attached K-1 is covered by § 7434 because neither is an "information return" as that term is defined for purposes of § 7434. (PDC's Br. in Supp. of Mot. to Dismiss ("PDC's Br. in Supp.") at 6-7 [Doc. #38].) In the alternative, the PDC contends that even if there could be a § 7434 claim

11

against it, the K-1s that it submitted are accurate which "is fatal" to the claim. (Id. at 8.)

Dr. Bruehl responds that he has sufficiently alleged that he was not a "bona fide partner of the PDC" and that it is a "sham partnership". (Pl.'s Resp. to Def. PDC's Mot. to Dismiss ("Pl.'s Resp. to PDC") at 6-8, 14-20 [Doc. #41].) He also contends that § 7434 covers Form 1065 "which incorporated information from the K-1". (Id. at 9-12.) According to Dr. Bruehl, even if the figures "on the returns accurately reflected the sham arrangements between the Defendants as to the compensation they paid to Plaintiff, that accuracy does not mean that the characterization of the compensation as wages and partnership income was accurate." (Id. at 12.)

Although the PDC and Dr. Bruehl focus on the K-1s, Dr. Bruehl alleges that the "fraudulent information return" was his W-2. (SAC ¶ 109 ("Defendants willfully and knowingly filed false and fraudulent W-2 forms . . . ."), ¶ 110 ("Defendants . . . filed false and fraudulent W-2s with the IRS . . . .").[4]) Although Dr. Bruehl alleges that "Defendants" filed these W-2s, his factual allegations never state that the PDC did so.[5] That, of course, is the crux of his complaint; he

_____

[4] Dr. Bruehl also alleges that "Defendants" "willfully misrepresented the amount of wages earned by [him] on [his] W-2s for 2016 and 2017 by underreporting wages and excluding payments made by the PDC", (SAC ¶ 80), but his work for Defendants did not begin until September 2018.

[5] Perhaps this explains the PDC's and Dr. Bruehl's focus on the question of whether a Form 1065 and its Schedule K-1 is an "information return" for purposes of § 7434. (See PDC's Br. in Supp. at 6-8; Pl.'s Resp. to PDC at 9-12; PDC's Reply Br. at 1-2.) Earlier this month, a district court in this circuit addressed

12

believes that the PDC should have done so because, as he alleges, he is an employee of the PDC, not a member. To hold the PDC liable for these alleged "false and fraudulent" W-2s that it is not actually alleged to have filed, Dr. Bruehl contends that the PDC is a "sham partnership" and that it and the Duke Defendants are his joint employers.

First, his allegations that the PDC is a "sham partnership" designed by Defendants as part of a scheme to "defraud the United States government and avoid paying" their portion of Dr. Bruehl's taxes lack any factual development and are conclusory and speculative. Next, even if the Duke Defendants and the PDC were his joint employers, his claim equates to the filing of the wrong return because he was misclassified as a member, rather than as an employee, of the PDC. The "dominant view" among courts is that these allegations do not state a claim under 26 U.S.C. § 7434. Butler v. Enter. Integration Corp., 459 F. Supp. 3d

---

arguments nearly identical to those made here and concluded that the Form 1065 and its Schedule K-1 is not an information return for purposes of § 7434. Cooke v. Lancelotta, No. SAG-22-297, 2022 WL 1027775 (D. Md. Apr. 5, 2022). According to 26 U.S.C. §§ 6031, 6041 and 26 C.F.R. § 1.6041-3 cited in Cooke and by the PDC, partnership returns are not "information returns" as defined in 26 U.S.C. § 6724(d)(1)(A) for purposes of § 7434. Dr. Bruehl fares no better with his other basis, 26 U.S.C. § 6051, because, among other reasons, the PDC did not withhold payments to which this statute would apply. Even if a Form 1065 and its Schedule K-1 were an "information return" for § 7434 purposes, the documents attached to the Second Amended Complaint show that the K-1s reported the same payments as listed in the PDC earnings statements. A § 7434 claim only lies when the information return is inaccurate as to the amount of payments made to the plaintiff. See infra at 14-18.

78, 106 (D.D.C. 2020) (describing the court's conclusion in <u>Liverett v. Torres</u> <u>Advanced Enterprise Solutions LLC</u>, 192 F. Supp. 3d 648 (E.D. Va. 2016)).

Without guidance from the Fourth Circuit, the best place to start is with the oft-cited opinion in <u>Liverett</u>.  Liverett alleged that his employer violated § 7434 "by intentionally misclassifying its employees as independent contractors on tax documents" and "defrauding the federal government for the purpose of avoiding paying certain employer taxes." 192 F. Supp. 3d at 649.  According to Liverett, "instead of issuing the IRS Form W-2s to which defendant's employees are entitled, [his employer] instead willfully issued IRS Form 1099s, which represented that [its] employees were independent contractors." <u>Id.</u> at 650.  However, he did not allege that the Form 1099s reported inaccurate amounts of payments made. <u>Id.</u>

Trying to determine if Liverett stated a claim for willful filing "of a fraudulent information return with respect to payments purported to be made to any other person", the Court confronted what it considered the ambiguity in the statute – what the phrase "with respect to . . ." modifies. <u>Id.</u>  As the court explained, "a Form 1099 that identifies plaintiff as an independent contractor when he is in fact an employee is an information return that is false with respect to plaintiff's employment status, but so long as the Form 1099 accurately reports the amount of wages defendant paid to plaintiff, the return is not fraudulent with respect to the amount of payments made." <u>Id.</u>  Thus, the question before the court was "whether § 7434(a) creates a private cause of action where . . . the alleged

14

misrepresentation is the filing of the wrong <u>type</u> of information return rather than a misrepresentation as to the amount of payments made." <u>Id.</u>

The court found no answer from the courts of appeals. <u>Id.</u> ("Interestingly, no court of appeals has addressed § 7434(a)'s ambiguity.") And the court gave no weight to the district courts that recognized a claim when an employer allegedly used the wrong information return because those "cases did not carefully consider the statutory language or directly address the ambiguity on the face of § 7434(a)" and instead simply "recited the elements of the cause of action". <u>Id.</u> at 651.

Thus, the court conducted its own thorough statutory analysis. <u>Id.</u> at 651-53. Two "significant and weight[y]" contextual clues informed its study. <u>Id.</u> at 652. The first is in § 7434(f) which defines "information return" as "any statement described in section 6724(d)(1)(A)." <u>Id.</u> Section 6724(d)(1)(A) defines "information return" as "any statement of the <u>amount of payments</u> to another person required by" the listed statutory provisions. <u>Id.</u> Thus, "an 'information return,' by definition, relates to the amount of payments to a person." <u>Id.</u> at 653. Therefore, "to avoid redundancy . . . the 'with respect to . . . ' language . . . describes the nature of the fraud, namely fraud as to the amount paid." <u>Id.</u> Next, the court looked to § 7434(e) which requires that "the court awarding damages in an action brought under subsection (a) . . . include a finding of the correct amount which should have been reported in the information return." <u>Id.</u> According to the court, "[t]his language demonstrates that Congress contemplated that actionable fraudulent representations would relate to the amount paid to the aggrieved

15

person." Id.  Thus, the court concluded that "§ 7434(a) creates a private cause of action only where an information return is fraudulent with respect to the amount purportedly paid to the plaintiff." Id.[6]  Because Liverett did not allege that the information returns reported inaccurate amounts of payments made to him, his claim failed. See id. at 655.

Distinguishing Liverett from the facts before it, the court in Greenwald v. Regency Management Services, LLC, 372 F. Supp. 3d 266 (D. Md. 2019), found the plaintiffs there stated a § 7434 claim.  The plaintiffs were employed as commissioned salespeople, were W-2 employees, received bi-weekly paychecks (for hourly wages plus commissions) with required tax deductions and withholdings, and were issued W-2s for wages earned. Id. at 268.  However, when the plaintiffs' employment ended, their employer paid their commissions on 1099 forms which required the plaintiffs to pay additional taxes on the commissions. Id.  They alleged that the defendants "'willfully mispresented' the amount of wages [the plaintiffs] earned on their W-2s by 'underreporting wages and excluding any commission amounts that were paid to them' after they left employment" so the defendants would "avoid paying the employer portion of the FICA, FUTA, and other federal state and income taxes". Id.

When the plaintiffs sued for violations of § 7434, the defendants moved to dismiss because § 7434 "does not apply to the misclassification of W-2 wages as

_____

[6] The Court also found that the "scant" legislative history on § 7434 was at least "instructive" and supported its interpretation of the statute. Id. at 653-54.

16

1099 independent contractor income." Id. at 269. The plaintiffs responded that they were not alleging that they were misclassified, but instead that the defendants "fraudulently underreported their wages on their W-2s". Id. The court agreed with the plaintiffs that these facts presented a different scenario than one in which a plaintiff believes he is simply misclassified. Id. (citing Liverett, 192 F. Supp. 3d at 653; Guerra v. Teixeira, No. TDC-16-0618, 2018 WL 3756716, at *8 (D. Md. Aug. 8, 2018); Tran v. Tran, 239 F. Supp. 3d 1296, 1298 (M.D. Fla. 2017)). These plaintiffs pled that they were W-2 employees throughout their work for the defendants, but that after their employment ended, the defendants chose to pay their commissions on 1099 forms and therefore underreported their wages by not reporting all earned wages. Id.

Similarly, the plaintiff in Czerw v. Lafayette Storage & Moving Corp., No. 16-CV-6701-FPG, 2018 WL 5859525, at *2 (W.D.N.Y. Nov. 9, 2018), which Greenwald cites for support, sufficiently stated a § 7434 claim. After Czerw had worked for decades as a W-2 employee for the defendants, they started paying him irregularly and paychecks began to bounce. Id. at *1. The defendants issued Czerw's final payments on a Form 1099 and inaccurately reported the amount of payments on the form. Id. at *1, *2, *4. Czerw alleged that the defendants "willfully, purposely, and fraudulently filed the false Form 1099-MISC as part of a scheme 'to defraud state and federal taxing authorities . . . by lessening [their] tax obligations and the amount of [their] worker's compensation insurance premiums.'" Id. at *2. Not only did Czerw allege that the Form 1099 inaccurately reported the

17

amount of payments made to him, but he also alleged "that Defendants misclassified [him] for the 2015 tax year – despite treating him as [a W-2] employee for the entirety of his employment – as well as by the facts suggesting that Defendants were facing business woes starting in May 2014." Id. at *2, *3. The court found these allegations plausibly stated a claim. Id. at *3, *4.

Applying both Liverett and Greenwald, the Butler court faced a question of first impression: "does § 7434 govern a situation in which a company allegedly mischaracterizes a plaintiff as an independent contractor and files a Form 1099 that accurately reports cash payments made to the plaintiff when the plaintiff alleges that he is neither a contractor nor an employee but rather an owner, entitled to claim the company's own gains and losses as his own for the purposes of documenting his income?" 459 F. Supp. 3d 78, 106-07 (recognizing that the Liverett court's "exhaustive textual analysis of the ambiguities in the statute has become the dominant view since" it was issued and not "a single post-Liverett decision that went the other way on a similar set of facts" could be found). The plaintiffs in Butler alleged they were mischaracterized as independent contractors rather than company owners, and the court easily found that was insufficient to state a claim. Id. at 106. However, the plaintiffs also alleged that "'the Form 1099s did not accurately report all income or losses related to [their] ownership interests in [the business]." Id. The court concluded that these allegations "make[] this situation closer to the circumstances in Greenwald and distinguish[] it from the

18

rule in <u>Liverett</u>" such that the plaintiffs had "'nudged their claims across the line from conceivable to plausible.'" <u>Id.</u> at 107.

The facts here are distinguishable from those in <u>Greenwald</u>, <u>Czerw</u>, and <u>Butler</u> and more akin to those in <u>Liverett</u>. Unlike the plaintiffs in <u>Greenwald</u> and <u>Czerw</u> who were always treated as W-2 employees throughout their employment, the PDC never treated Dr. Bruehl as a W-2 employee, never deducted any taxes from his monthly earnings, and never issued him a W-2. Unlike the <u>Butler</u> plaintiffs who alleged that the company outright failed to report their income and losses as company shareholders, all of Dr. Bruehl's earnings were reported, albeit on separate returns. Like Liverett, though, Dr. Bruehl contends he was an employee and should have been issued a W-2, not a K-1. He has alleged nothing more than a misclassification. His allegation that the misclassification led to the under-reporting of his W-2 wages does not change that conclusion. The purported inaccuracy stems only from his contention that he was supposed to have been treated as an employee, not a member, of the PDC. As the <u>Liverett</u> court persuasively concluded, such misclassification does not state a § 7434 claim. Therefore, Dr. Bruehl's § 7434 claim against the PDC is dismissed.

2.

The Duke Defendants argue that Dr. Bruehl's § 7434 claim against them fails because he only alleges that the wrong type of form was used to report his payments and does not allege that the amount of payments was misrepresented. (Mem. of Law in Supp. of Duke Defs.' Mot. to Dismiss Pl.'s SAC ("Duke Defs.' Br.

19

in Supp.") at 11 [Doc. #40].) They also challenge the allegation that they could be liable as joint employers with the PDC for the PDC's filing of the Schedule K-1s reporting payments the PDC made to Dr. Bruehl. (Id. at 11-12.) And, even if the Duke Defendants could be liable, they argue that a Schedule K-1 is not an "information return" for purposes of § 7434. (Id. at 12.)

Dr. Bruehl responds that he alleges more than the filing of the wrong forms; he alleges that "Defendants, together" underreported his W-2 wages to minimize their tax liability. (Pl.'s Resp. to Duke Defs.' Mot. to Dismiss Pl.'s SAC ("Pl.'s Resp. to Duke Defs.") at 15 [Doc. #42].) And he contends that it is "irrelevant" that "Defendants accurately reported what they paid to [him]", because "they intended to defraud the government of taxes to which it would otherwise be entitled by their filings." (Id. at 12.) He clarifies that the "Duke Defendants are . . . not liable for the PDC's K1s or 1065, but for their own returns which did not contain the amounts it [sic] should have paid . . . under § 3111". (Id. at 17.) And Dr. Bruehl remains steadfast in his position that a Schedule K-1 is an "information return". (Id. at 17-19.)

As explained above, there is no § 7434 claim for the willful filing of the wrong type of information return. A plaintiff must allege, among other things, that the amount of payments reported on the return is wrong. Dr. Bruehl attempts to distinguish his allegations from those in Liverett and align them with those in Greenwald and Butler. (Pl.'s Resp. to Duke Defs. at 13-15.) But he focuses only on the allegations in Greenwald, Butler, and his Second Amended Complaint that

20

"Defendants willfully underreported the amounts" on W-2s to shift the tax burden and to defraud the government. (Id. at 15.) Yet the plaintiffs in Greenwald and Butler alleged more than that, as explained above.

Dr. Bruehl clarifies that he is not seeking to hold the Duke Defendants liable for the PDC's Form 1065s and Schedule K-1s, but for their own W-2s "which did not contain the amounts it [sic] should have paid for [him] . . . under § 3111." Yet, he does not allege that the Duke Defendants inaccurately reported on the W-2s what they paid him. Instead, he contends that his PDC earnings should also have been reported on a W-2 because he was its employee, not its member. But, as noted above, this is no different than alleging that he was misclassified and the wrong form was used to report his earnings. To bolster his claim, Dr. Bruehl unsuccessfully relies on his conclusory and speculative allegations that the Duke Defendants and the PDC devised a scheme to divert tax liability and defraud the government. Thus, Dr. Bruehl's § 7434 claim against the Duke Defendants is dismissed.

B.

Dr. Bruehl's North Carolina Wage and Hour Act claim against Defendants is brought on supplemental jurisdiction, 28 U.S.C. § 1367(a). As is relevant here, a court "may decline to exercise supplemental jurisdiction over a claim . . . if . . . the district court has dismissed all claims over which it has original jurisdiction". 28 U.S.C. § 1367(c)(3). The only claim over which the Court has original jurisdiction, the alleged violation of 26 U.S.C. § 7434, is being dismissed. The Court declines

21

to exercise supplemental jurisdiction over Dr. Bruehl's North Carolina Wage and Hour Act claim. Accordingly, it is dismissed without prejudice.

III.

For the reasons stated in this Memorandum Opinion, IT IS HEREBY ORDERED that Private Diagnostic Clinic's Motion to Dismiss [Doc. #37] is GRANTED IN PART as to Count I. IT IS FURTHER ORDERED that Duke University, Duke University School of Medicine, and Duke University Health System, Inc.'s Motion to Dismiss Plaintiff's Second Amended Complaint [Doc. #39] is GRANTED IN PART as to Count I. A judgment dismissing Count I with prejudice and Count II without prejudice will be entered contemporaneously with this Memorandum Opinion and Order.

This the 18th day of April, 2022.

/s/ N. Carlton Tilley, Jr.
Senior United States District Judge